IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DOROTHY WIDERBORG, )
)
Plaintiff, )
)
v. ) CIVIL ACTION NO. 1:06CV560-SRW
) (WO)
MICHAEL J. ASTRUE, Commissioner )
of Social Security, )
)
Defendant. )

**MEMORANDUM OF OPINION**

Plaintiff Dorothy Widerborg brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits and supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

Plaintiff's treatment for breast cancer. In January 1997, plaintiff underwent a lumpectomy and axillary dissection of her right breast due to infiltrating ductal carcinoma. (R. 126-30; 142-43). She had radiation therapy in March and April 1997. (R. 161). Thereafter, she had regular mammograms at Lyster Army Community Hospital, all with benign findings. (See R. 133,136,140, 174). In visits to the general surgery clinic at Lyster

to follow up on her breast surgery, the surgeon noted on July 31, 2001 and October 4, 2002 that "Pt has no complaints." (R. 111, 118). In a March 2002 breast cancer follow up visit to the surgeon, plaintiff complained only of cold and upper respiratory symptoms. (R. 116).[1] In the March and October 2002 visits, plaintiff's pain rating was recorded as "0" on a scale of 1-10. (R. 111, 116). In April 2002,[2] plaintiff reported that her entire right arm was painful for several days, but that the pain had subsided. Her clinical examination was normal. (R. 109).

In addition to her visits at Lyster, plaintiff returned to the Tri-State Cancer Center, where she had received her radiation treatments, for follow up. August 2002 treatment notes indicate that she was "doing well." (R. 155). In August 2003, Dr. Adams noted that plaintiff had "no complaints other than occasional right arm weakness . . . no arm edema, no systemic pain. (R. 154). Dr. Adams' notes for February 5, 2004 indicate that plaintiff "continued to have right arm and right axillary discomfort" and "numbness in the arm which is a chronic problem for her." (R. 173). On August 5, 2004, Dr. Adams recorded that plaintiff "has done well over the interval [since her breast surgery]. She continues to have some discomfort of the arm, otherwise no complaints." In treatment notes for a February 9, 2005 visit, Dr. Adams stated, "[s]he has experienced chronic pain and numbness in the right arm since undergoing her treatment in 1997." Dr. Adams noted no abnormalities in any of his physical

---

[1] Plaintiff was treated in April 2002 for upper respiratory infection and in September 2002 for complaints of abdominal cramping and diarrhea. (R. 113-15).

[2] The year of the examination is illegible in the court's copy of the record. However, the physician notes that his patient was 5 years status post right lumpectomy and axillary dissection. (R. 109).

examinations of the plaintiff.

Plaintiff's treatment for hypercalcemia and osteopenia. In November 2000, plaintiff was referred to Dr. Wise, an endocrinologist, after routine blood work revealed hypercalcemia. Plaintiff reported that she had experienced generalized aching in her bones for two to three months, but "no significant malaise or fatigue." (R. 105-06). Bone mineral density testing conducted on December 4, 2000 showed mild osteopenia in plaintiff's lumbar spine and hip. Dr. Wise noted that plaintiff's total calcium was only minimally elevated and that she had no severe bone loss. He prescribed Actonel "to provide her some protection" and planned to repeat her bone density testing in one year. (R. 103). In May 2001, Dr. Wise noted that plaintiff's total calcium level on repeat testing was in the "mid normal range" and that she was tolerating the Actonel without side effect. (R. 102). Bone density testing on January 5, 2002 showed an increase of 3% in plaintiff's spine and 5% in her hip. Dr. Wise noted that plaintiff's "hypercalcemia" was currently normal, and that her osteopenia was responding well to Actonel. (R. 101). In January 2003, plaintiff returned to Dr. Wise for a follow up visit. Dr. Wise again noted that plaintiff was tolerating her Actonel without side effects. Her calcium level and physical examination were normal, and Dr. Wise indicated that "[s]he is having no significant symptoms at present except for mild nocturia." (R. 100-01).

Plaintiff's treatment for ganglion cyst, left wrist. On February 8, 2000, plaintiff had surgery to remove a dorsal ganglion cyst on her left wrist. The surgical record reflects that plaintiff had noted the cyst for several months, and that over the previous few months it had

increased in size and caused pain with strenuous activity of the wrist, especially dorsiflexion. (R. 121-23). The record reveals no other treatment for problems with plaintiff's left wrist or hand.

On September 15, 2003, plaintiff filed an application for disability insurance benefits and supplemental security income, alleging that she became disabled on January 31, 2003 due to weakness and numbness on the right side of her body and "left hand problems." She claimed that she could not lift anything with either hand and that her "entire body hurts." (R. 63). On December 16, 2003, Mark Ellis, D.O., performed a consultative physical examination of the plaintiff. Dr.Ellis' report states:

> She states that after she had the radiation and surgery, she was left with numbness, which begins under the right armpit and goes all the way down the inside of her arm, and involves the four fingers of the right hand. It does not involve the thumb. She states she went to the doctor for this and they told her it was going to be this way for the rest of her life. Consequently, she feels like she has no strength in her right arm. She has occasional sharp pain going down her right arm and the pain varies in intensity. She states she cannot lift greater than ten pounds with her right arm. When I asked her to give me an example, she feels that she could probably tote a bag of groceries with her right arm. She states she has had surgery on her left hand done in the past for a calcium deposit. She states after the surgery she has had numbness in all of her fingers of her left hand since that surgery.

(R. 168). Dr. Ellis indicated that the review of systems "is positive only for the numbness and weakness in her right arm and also for the numbness in her left hand." (Id.). Under "social history," he writes, "She last worked in January of 2003 as a restaurant worker, but she states that business went out of business and so she has not worked since that time." (Id.). During the examination, plaintiff complained of decreased sensation to light touch in her right hand, arm, and fingers of the left hand. (R. 169). Dr. Ellis noted his impression of

"[p]eripheral sensory neuropathy in both the right and left hands, etiology of this is somewhat unclear." (R. 170). He concluded:

> Patient walked with a normal gait. She did have full range of motion of the MCP and PIP joints of both hands. She was able to make a fist with both hands. She was able to oppose the thumb to all fingers. Had normal grip strength and normal pinch strength with both hands. She was able to manipulate objects with both hands. She used no cane or assistance device. She used her right arm to gesture and to point to things during the exam. Range of motion on both wrists were slightly decreased. The patient indicates this is from discomfort when she tries to move them further. I find no structural restrictions on the wrists. The patient gave moderate effort during the exam. She had to be encouraged sometimes to give full effort.

(R. 170). Dr. Ellis recorded a normal range of motion for plaintiff's shoulder, elbow and forearm. (R. 171).

On April 13, 2005, after the claim was denied at the initial administrative level, an ALJ conducted an administrative hearing. At the hearing, plaintiff testified that she quit driving a couple of years previously because she "lost strength on the right side of [her] body so that caused a problem." (R. 211). When the ALJ asked why plaintiff had stopped working, she testified, "I was having problems lifting and writing and then eventually the job closed down. Well she sold the job but I still could have had a job but I was having health problems." (R. 212). Plaintiff further testified as follows:

> The problems that keeping me from . . . working is that when I had my lumpectomy they had to remove my lymph nodes under my arm which damaged all the nerves in my arm which keeps my right arm, is, I wouldn't say it's paralyzed but it's numb, it stays cold and it's numb. I feel the sensation of pins sticking in it and a tingling all the time and I get tired, like really, just to say to get up to walk to the bathroom drains me. I get really, really tired and I was still trying to work and I got to the point where I can't hold a pencil, you know write, because of my fingers and it just become too painful so I stopped working.

(R. 213). Plaintiff testified that when she told Dr. Adams that it was difficult for her to work or hold anything in her hand, he said "it might be nice" if plaintiff would apply for disability. (R. 214). According to plaintiff, Dr. Adams also told her that her nerves were permanently damaged and would bother her for the rest of her life, and that plaintiff's fatigue was a side effect of the radiation that she would "have to live with." (R. 214-15). Plaintiff further testified:

> I have severe sinus problems. I, to the point where it's like numbs, paralyzes the left side of my body to the point where they thought I was having a stroke or a heart attack. I have to constantly go to the doctor for that. I'm on sinus medicine, I also have problems from, in October I had my gall bladder removed and I'm having some serious problems from that.
>
> * * * * *
>
> I have uncontrollable diarrhea and I have severe pain from that one puncture where they did up in my breast and it, it bothers me really bad to breath[e]. I don't breath[e] properly.

(R. 215-16). She stated that she has bad headaches three times a day and that "[t]hey'll come and they'll go but when they go you, the pain is not there but my, the left side of my face is like paralyzed, I'm not, numb." (R. 216). When asked about any problems caused by her osteoporosis, plaintiff responded:

> With my bones I have problems with these little calcium deposits pop up over my body and when they pop they are very painful and I've had surgery on my left hand to remove one but it comes back and I've got this one in my chest and that can be very painful and there's no medication I'm taking for it because they just happen.

(R. 217). Plaintiff testified that, because of problems with her right and left hands, she can lift about five pounds but not constantly hold it. (R. 217-18). She stated that she has to "lay

down about all day, off and on all day, probably five or six hours a day," because she is "really tired" and "drained" and is "always in pain." Her pain, most of the time, is a level seven on a scale of ten. When it is higher than a seven, she takes pain pills. Her pain and other medications cause side effects including "double vision, headaches on top of the headaches that you're already having, nausea, constipation." (R. 218-19). She stated that she is being referred to a neurosurgeon because "I'm experiencing numbness and pain in my left side, my left leg, from my ankle all the way to my knee, it go numb and I gotta see a neurosurgeon for that and my face." She testified that this leg numbness started in about November 2004, and that a Dr. Beck referred her to a neurosurgeon when she had to go to the emergency room for her legs and for the numbness on her left side. (R. 219).

The ALJ asked plaintiff's representative if she could get a physical capacities evaluation or letter regarding plaintiff's work activity from Dr. Adams or one of plaintiff's other doctors. Plaintiff's representative responded that Dr. Adams had declined to fill out their forms ("they said they don't fill the forms out") and that Dr. Beck's medical facility has a policy against completing the forms. The ALJ then advised plaintiff's representative that he would order a consultative examination from an internal medicine specialist. (R. 220).

Dr. William D. King, an internist, conducted a consultative examination on June 15, 2005. The history section of his report reads as follows:

> Ms. Widerborg states that she has been tired since she had radiation therapy about 7-8 years ago for breast cancer. Apparently she had a lumpectomy followed by radiation therapy. Since that time she complains of fatigue just sort of all over. Also states that her right arm is numb mostly on the posterior part of the arm around the triceps muscle area where she says it is the most severe, but it goes all the way down and affects her 2nd, 3rd and 4th digits

> which does not make any sense as far as nerve distribution, however that is what she says. She says the numbness makes it difficult for her to use her right arm. She also claims that she has had a cyst removed from her left wrist and makes the wrist some what painful and difficult to use that arm as well. The weakness she is very vague about that. She says it tends to come and go and not any particular time, but it makes her afraid to drive because she feels weak sometimes.

(R. 182). She complained of musculoskeletal chest pain, and told Dr. King that she has about four bowel movements per day, sometimes loose and uncontrollable. She denied any other myalgias or arthralgias other than in the right arm and left wrist. (R. 183). With regard to his physical examination of her extremities, Dr. King reported:

> Upper extremities shoulders both have full range of motion and elbows with full range of motion. Wrists have full range of motion. MCP, PIP and DIP joints are all normal. Grip strength is 5/5 bilaterally. Hand dexterity is normal. She does have evidence of what looks like a ganglion cyst type surgery on the left wrist that she claims is tender to palpation. It does not limit the use of her wrist that I can tell. She claims that she has soreness in the posterior part of the right arm mostly in the triceps muscle although I see nothing on exam to explain why she would be having this tenderness. Her axillary exam is also normal. There are []no signs of lymphodema in that arm. Lower extremities hips have full range of motion and knees have full range of motion. Feet and ankles are normal.

(R. 184). As to the neurological portion of the examination, he noted, "There are no gross motor or sensory deficits with the exception of her claimed numbness in the posterior part of her right arm radiating down into the right hand and into the 2nd, 3rd, and 4th digits some how remarkably sparing the 5th digit." (Id.). Dr. King stated, "I have filled out the medical source opinion form the best I can based mainly on her history since her physical exam is essentially normal." (Id.). He concluded:

> Based on these medical findings, despite the above mentioned impairments, her ability to do work related activity such as sitting and standing are not

> impaired. Walking should not be impaired. Lifting and carrying and handling objects maybe impaired because of the claimed numbness in the right hand, although it is not evident on exam. Hearing and speaking are not impaired. Traveling should not be impaired except that she states that she is sometimes too tired to drive.

(R. 185).

The ALJ rendered a decision on October 25, 2005. The ALJ concluded that plaintiff suffered from the severe impairments of osteopenia and residuals of breast cancer. (R. 21). He found that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform jobs existing in significant numbers in the national economy. Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act. On May 31, 2006, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.[3]

**STANDARD OF REVIEW**

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole

---

[3] Plaintiff directs the court to a physical capacities questionnaire and pain questionnaire completed by Dr. Ronda Carter. This evidence was not before the ALJ, but was presented to the Appeals Council. Plaintiff does not argue that this evidence meets the "new evidence" standard for a sentence six remand, and the court concludes that it does not. Instead, plaintiff urges the court to consider this evidence in deciding whether the ALJ's decision is supported by substantial evidence. Since the evidence was not before the ALJ, the court may not consider it on the substantial evidence issue. Falge v. Apfel, 150 F.3d 1320, 1323 (11th Cir. 1998)(when Appeals Council has denied review, reviewing court may "look only to the evidence actually presented to the ALJ in determining whether the ALJ's decision is supported by substantial evidence").

to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

**DISCUSSION**

The plaintiff challenges the Commissioner's decision, arguing that the ALJ erred by concluding that plaintiff is capable of performing the full range of light work, and that he erred by failing to find her left wrist impairment and chronic fatigue to be severe impairments. Plaintiff does not specifically argue that the ALJ's credibility determination was flawed. However, the question of whether the ALJ's decision in this case is supported by substantial evidence turns on whether he assessed her credibility properly. While plaintiff testified to disabling symptoms, none of plaintiff's treating physicians imposed any limitations on plaintiff's ability to perform work related functions.[4] Additionally, although

[4] Plaintiff argues that Dr. Carter, who completed the questionnaires plaintiff submitted to the Appeals Council, is her treating physician. However, there is no evidence in the record that Dr. Carter has ever treated the plaintiff. Additionally, as noted previously, this evidence may not be considered in assessing whether the ALJ's decision is supported by substantial evidence.

the physical capacities evaluation form completed by Dr. King includes certain non-exertional limitations, Dr. King makes clear that the physical examination was normal and that he completed the form based primarily on plaintiff's subjective complaints. Additionally, the only abnormalities noted in Dr. Ellis' consultative examination were a result of plaintiff's subjective reports of decreased sensation and decreased range of motion in her wrists due to "discomfort when she tries to move them further." (R. 170).

The ALJ found plaintiff's allegations of disability not credible, noting that her allegations are "not supported by her history of treatment, are not supported by the opinion or records of any treating source, and are not supported by the reports from consulting medical sources." (R. 21). With regard to plaintiff's allegations of fatigue and her testimony that she had to lie down for five to six hours each day, the ALJ noted that "[t]he record does not indicate any medical basis for the claimant requiring any rest periods throughout a day or workday, and no treating medical source indicated she alleged such severe limitations of activities." The ALJ further observed that there is no medical documentation of plaintiff's gall bladder surgery, which plaintiff claims resulted in uncontrollable diarrhea, severe pain, and inability to breathe properly, and also noted that plaintiff did not mention these symptoms to Dr. King when he examined her in June 2005. (See R. 215-16, 183).[5] The ALJ further observed that while plaintiff testified that her medications caused her to have double vision, nausea, and constipation, none of her medical records include any complaints of adverse effects from her medications.

[5] Plaintiff was represented at the hearing, and the ALJ was not bound to develop the record for the period after the application was filed. See Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003).

The Eleventh Circuit pain standard, which applies to other subjective symptoms, requires "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005)(quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)). Plaintiff's medical evidence does not demonstrate the existence of objectively determined medical conditions which could reasonably be expected to give rise to the symptoms she alleges. Even assuming that her medical evidence satisfies the pain standard, the ALJ has articulated adequate reasons, supported by substantial evidence, for rejecting plaintiff's testimony of disabling functional limitations.

Severity of left wrist impairment and chronic fatigue. The determination of the severity of an impairment is a "threshold inquiry" which "allows only claims based on the most trivial impairments to be rejected." McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986).

> The claimant's burden at step two is mild. An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience. Claimant need show only that her impairment is not so slight and its effect is not so minimal.

Id.; see also Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984)("[A]n impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work,

irrespective of age, education, or work experience.”).

With regard to plaintiff’s left wrist, the medical record includes no diagnosis of any medically determinable impairment of the left wrist other than the ganglion cyst which was surgically removed in February 2000. Dr. Ellis noted a “slightly decreased” range of motion and plaintiff reported decreased sensation in the fingers of her left hand during the consultative examination in December 2003. However, Dr. Ellis specifically stated that he found no structural restrictions on the wrist, and that plaintiff gave only moderate effort during the exam. Additionally, Dr. Ellis did not indicate that plaintiff suffered any work related functional limitation due to any impairment of her left wrist. (R. 169-70). In Dr. King’s consultative examination in June 2005, Dr. King observed a full range of motion in plaintiff’s wrists. (R. 184). He also noted that her had dexterity is normal and that her grip strength is 5/5 bilaterally. He noted that “she does have evidence of what looks like a ganglion cyst type surgery on the left wrist that she claims is tender to palpation. It does not limit the use of her wrist that I can tell.” (Id).

As the ALJ observes (R. 20), the medical record includes no evidence of a medical basis for plaintiff’s claimed fatigue. Plaintiff testified that Dr. Adams told her that her fatigue was a side effect of the radiation treatment in the spring of 1997. (R. 214-15). However, as also noted by the ALJ, plaintiff’s treatment records do not indicate that plaintiff complained to Dr. Adams or to her treating physician at Lyster about fatigue. (See Exhibits 2F, 3F, 7F; see specifically R. 105 (in November 2000, “She has no significant malaise or fatigue”), R. 111 (in October 2002 “Pt has no complaints”), R. 116 (in March 2002,

complaining only of "cold/URI symptoms x 1 wk"), R. 118 (in July 2001 "Pt has no complaint"), R. 154 (in August 2003, "[s]he has no complaints other than occasional right arm weakness"), R. 180 (in February 2005, no indication that plaintiff complained of fatigue), R. 181 (same in August 2004)). The ALJ's determination that plaintiff's severe impairments do not include wrist problems or fatigue is supported by substantial evidence.

Plaintiff's residual functional capacity. Plaintiff argues that the ALJ erred by concluding that she is capable of performing the full range of light work. Again, however, plaintiff's contention that she cannot perform the full range of light work depends on the credibility of her testimony. Dr. Adams and the consultative examiners recorded plaintiff's subjective complaints, including arm and axillary pain and numbness, but there is no objective evidence of neurological deficits. None of plaintiff's treating physicians have expressed an opinion that plaintiff has work related functional limitations. Dr. King included non-exertional limitations in his physical capacities evaluation. The ALJ rejected these limitations, explaining that he did so because: (1) no report from a treating source referred to loss of use of the extremities or to any findings that would warrant environmental restrictions; and (2) Dr. King's examination was, as Dr. King himself noted, essentially normal. (R. 18-19). "'The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" Davis v. Barnhart, 2006 WL 2038751, *2 (11th Cir. Jul. 21, 2006)(unpublished opinion)(quoting Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985)).

Plaintiff claims to have had the alleged problems with her right arm and her fatigue

since her surgery and radiation therapy in early 1997. She asserts that the problems with her left hand date back to her surgery in 2000. (R. 182, 213, 168). The Commissioner accurately notes that plaintiff performed work which, by her description, met or exceeded the demands of light work until 2003, several years after her breast surgery and radiation therapy. (R. 75-77). Plaintiff did not cease working until over three and a half years after the surgery to remove the ganglion cyst on her left wrist. (R. 121-23, 211-12).

The ALJ's conclusion that plaintiff is able to perform a full range of light work is supported by substantial evidence.[6] The ALJ articulated adequate reasons for rejecting the non-exertional limitations testified to by the plaintiff and included in Dr. King's physical capacities evaluation. Thus, the ALJ did not err in relying on the medical-vocational guidelines to support his Step 5 determination that plaintiff is not disabled.

**CONCLUSION**

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and is due to be affirmed. A separate judgment will be entered.

DONE, this 26th day of June, 2007.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

[6] Plaintiff argues that the ALJ's RFC determination does not include a "function-by-function" assessment. However, the ALJ found that plaintiff has "the following residual functional capacity: lift and carry objects weighing 20 pounds; frequently lift and car[r]y objects weighing 10 pounds, sit, stand, and walk without restriction; perform all communicative and manipulative functions of work without limitation; and sustain work activities in all environmental and postural settings." (R. 21).